**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 18-2370

OUTDOOR AMUSEMENT BUSINESS ASSOCIATION, INC.; MARYLAND STATE SHOWMEN'S ASSOCIATION, INC.; THE SMALL AND SEASONAL BUSINESS LEGAL CENTER; LASTING IMPRESSIONS LANDSCAPE CONTRACTORS, INC.; THREE SEASONS LANDSCAPE CONTRACTING SERVICES, INC; NEW CASTLE LAWN & LANDSCAPE, INC.,

Plaintiffs – Appellants,

v.

DEPARTMENT OF HOMELAND SECURITY; UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES; DEPARTMENT OF LABOR; EMPLOYMENT & TRAINING ADMINISTRATION; WAGE & HOUR DIVISION,

Defendants – Appellees,

--------------------------------

MARGHARITA KURI; TIMOTHY KING; HENRY WOJDYLO; RONALD NYENHUIS; SHIRLEY HARMON; ANTONIO RIVERA MARTINEZ; ANDREW MITSCHELL; COMITÉ DE APOYO A LOS TRABAJADORES AGRICOLAS (CATA); PINEROS Y CAMPESINOS UNIDOS DEL NOROESTE; NORTHWEST FOREST WORKERS CENTER,

Amici Supporting Appellees.

United States District Court for the District of Maryland. Ellen L. Hollander, District Judge. (1:16-cv-01015-ELH)

Argued: September 10, 2020                         Decided: December 18, 2020

---

Before KEENAN, WYNN, and RICHARDSON, Circuit Judges.

---

Affirmed in part and vacated in part by published opinion. Judge Richardson wrote the opinion, in which Judge Keenan and Judge Wynn joined.

---

**ARGUED:** Robert Wayne Pierce, PIERCE LAW FIRM, Annapolis, Maryland; Leon R. Sequeira, Arlington, Virginia, for Appellants. Kathryne M. Gray, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees. Clermont Fraser Ripley, NORTH CAROLINA JUSTICE CENTER, Raleigh, North Carolina, for Amici Curiae. **ON BRIEF:** Joseph H. Hunt, Assistant Attorney General, William C. Peachey, Director, Erez Reuveni, Assistant Director, Glenn M. Girdharry, Assistant Director, Joshua S. Press, Office of Immigration Litigation, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees. Edward Tuddenham, Paris, France; Art Read, JUSTICE AT WORK, Philadelphia, Pennsylvania; Vanessa Coe, LEGAL AID SOCIETY OF PALM BEACH COUNTY, INC., West Palm Beach, Florida; D. Michael Dale, NORTHWEST WORKERS' JUSTICE PROJECT, Portland, Oregon, for Amici Comité de Apoyo de Los Trabajadores Agricolas (CATA), et al.

RICHARDSON, Circuit Judge:

H-2B visas provide vital employees for employers who need temporary nonagricultural workers but cannot find help domestically. Each year, H-2B visas allow 66,000 temporary workers to enter the country to meet those demands. A core part of the H-2B visa program is labor certifications—the process of determining whether American workers are available and whether employment of H-2B workers would adversely affect similarly employed American workers.

For at least 50 years, the agency in charge of H-2B visas relied on the Department of Labor to provide labor certifications. In 2008, the Department of Homeland Security (the agency now charged with administering the H-2B program) passed rules requiring that employers receive a favorable labor certification from Labor (as Homeland Security's chosen "consulting agency") before obtaining a visa. To implement and structure this labor-certification process, Labor promulgated several program and wage regulations. This set off an avalanche of litigation that led to Homeland Security and Labor jointly issuing a new series of rules in 2015.

Plaintiffs, a group of employers and associations whose members rely on H-2B visas, challenge Homeland Security's 2008 Rules and the joint 2015 Rules as exceeding the agencies' statutory authority. We agree with the district court that the challenge to the 2008 Rules is time-barred. We conclude that Plaintiffs lack standing to challenge the 2015 Enforcement Rules and therefore vacate the district court's decision on the merits as to those rules. But we agree with the district court that the remaining Rules—the 2015 Program and Wage Rules—were properly promulgated.

3

## I.    Background

Plaintiffs are a group of employers and associations whose members rely on H-2B visas to find workers for their temporary nonagricultural jobs ("Employers"). Employers sued to challenge a series of regulations promulgated by Homeland Security and Labor governing the H-2B program. Employers claim that these rules exceeded the Government's statutory authority. *See* 5 U.S.C. §§ 558 and 706(2)(C). Employers argue that several of its named members have been harmed by these "unworkable" Rules, as the Rules have increased compliance costs, caused delays, and led to bankruptcies, layoffs, and breaches of contract. Supplemental Br. of Employers 1. And Outdoor Amusement, an organization representing some of the Employers, alleges that it has lost members and diverted resources to educate and ensure their remaining members comply. *Id*. at 10.

The first set of challenged rules are Homeland Security's 2008 Rules. Those Rules require an employer to receive a favorable labor certification from Labor before submitting an H-2B petition to Homeland Security. 8 C.F.R. § 214.2(h)(6); 73 Fed. Reg. 78,104, 78,129.[1] Before these Rules, employers still had to seek a labor certification, but they could request a review by Homeland Security if they were denied. 31 Fed. Reg. 4446 (Mar. 16, 1966); 8 C.F.R. § 214.2(h)(6)(iv)(D), (E) (2008); *see also G.H. Daniels III & Assocs., Inc. v. Perez*, 626 F. App'x 205, 207 (10th Cir. 2015). Under the 2008 Rules, however, Homeland Security would not consider granting an H-2B petition if Labor denied the

---

[1] A labor certification may be granted if United States workers able to perform the temporary labor are unavailable and the H-2B's employment will not adversely affect similarly employed United States workers. 8 C.F.R. § 21432(h)(6)(iii)(A).

4

employer a labor certification. 8 C.F.R. § 214.2(h)(6)(iii)(C). If Labor refused to issue a certification, an employer's only recourse after the 2008 Rules was to appeal within Labor to obtain a certification. 8 C.F.R. § 214.2(h)(6); 73 Fed. Reg. 78,063, 78,104, 78,129. Employers argue that the 2008 Rules abrogate Homeland Security's statutory duty to be the agency determining every petition by making petitions contingent on a favorable labor certification from Labor.

The Employers also challenge two sets of rules from 2015: the 2015 Program Rules establishing the standards governing the labor-certification-application process, 80 Fed. Reg. 24,042, and the 2015 Wage Rules setting the standards for determining prevailing wages to be paid to H-2B workers, 80 Fed. Reg. 24,146. Employers contend that these 2015 Program and Wage Rules exceed Homeland Security and Labor's statutory authority because Homeland Security cannot pass rules about labor certifications controlling Labor and Labor lacks authority to issue any rules governing its own conduct in granting the labor certifications.

The district court rejected these challenges and granted summary judgment upholding the regulations.

## A.    Statutory framework and history

Congress passed the Immigration and Nationality Act ("INA") in 1952 to collect and reorganize existing immigration law. 66 Stat. 163, 168 (1952), now 8 U.S.C. § 1101 *et seq*. As part of this law, Congress gave the Attorney General authority to administer and enforce laws and regulations about the admission of aliens. 8 U.S.C. § 1103(a)(1). Congress later transferred this authority to the Secretary of Homeland Security. Homeland

5

Security Act of 2002, Pub. L. No. 107-296, § 402, 116 Stat. 2135, 2178 (2002). The Secretary is given broad authority over immigration: "The Secretary of Homeland Security [is] charged with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens." 8 U.S.C. § 1103(a)(1). And Congress has directed the Secretary to "establish such regulations . . . and perform such other acts as he deems necessary for carrying out his authority under the provisions of this chapter." § 1103(a)(3).

One of the Homeland Security Secretary's duties is administering the nonimmigrant H-2 Visa Program for temporary unskilled workers. 8 U.S.C. § 1184(c)(1). In administering this program, "any specific case or specific cases shall be *determined* by the [Secretary], after *consultation with appropriate agencies* of the Government, upon petition of the importing employer." *Id.* (emphasis added). The employer's petition must be approved for an H-2 visa to be granted. And that "petition *shall be in such form and contain such information as the [Secretary] shall prescribe*." *Id.* (emphasis added).

Congress has bifurcated the H-2 visa program for temporary foreign workers. *See* 8 U.S.C. § 1101(a)(15)(H)(ii) (a)–(b). The first piece, H-2A, provides visas for temporary *agricultural* workers. The second, H-2B, permits employers to hire temporary *nonagricultural* workers. This case concerns this second visa program, H-2B.

H-2B visas are statutorily available for those aliens (1) "having a residence in a foreign country which [they] ha[ve] no intention of abandoning" and (2) "who [are] coming temporarily to the United States to perform other [nonagricultural] temporary service or labor," but only (3) "if unemployed persons capable of performing such service or labor

6

cannot be found in this country." 8 U.S.C. § 1101(a)(15)(H)(ii)(b). And whether these three criteria are satisfied must be "determined" by the Secretary of Homeland Security "after consultation with appropriate agencies." 8 U.S.C. § 1184(c)(1).

## B.    Regulatory framework and history

Historically, the Attorney General had chosen to consult with Labor to determine "if unemployed persons capable of performing such service or labor cannot be found in this country." 8 U.S.C. § 1101(a)(15)(H)(ii)(b); 31 Fed. Reg. 4446, 6611 (1966); 18 Fed. Reg. 4925 (1953); 38 Fed. Reg. 35,427 (1973).[2] And, as the consulting agency, Labor issued various letters determining the standards for labor certifications. *See LFA*, 889 F. Supp. 2d at 715–17 (collecting various letters).

In 2008, Homeland Security promulgated rules, after notice and comment, that formalized the process by requiring a certification from Labor that the employer's temporary jobs could not be filled with American workers and that H-2B workers would

---

[2] Labor has had a hand in immigration since its inception in 1913 and has expertise in wages and the labor market. *See La. Forestry Ass'n, Inc. v. Solis (LFA)*, 889 F. Supp. 2d 711, 715–17 (E.D. Pa. 2012), *aff'd sub nom. La. Forestry Ass'n Inc. v. Sec'y U.S. Dep't of Labor*, 745 F.3d 653 (3d Cir. 2014). In 1968, the Attorney General promulgated regulations requiring employers to apply for labor certifications from Labor as part of the Attorney General's duty to consult. 8 C.F.R. § 214.2 (1968). The regulations directed an administrator to issue a labor certification "if he finds that qualified persons in the United States are not available and that the terms of employment will not adversely affect the wages and working conditions of workers in the United States similarly employed." 20 C.F.R. § 621.3(a) (1968); *see also* 8 C.F.R. § 214.2(h)(6)(iv)(A). In turn, Labor issued regulations to govern the labor-certification process. 20 C.F.R. § 621.3 (1968); 33 Fed. Reg. 7570–71 (1968). These regulations were justified under 8 U.S.C. §§ 1101 and 1184, which have not changed since these rules. *Id*. Similar rules remained intact for 50 years. *See* 43 Fed. Reg. 19,306–18 (1978); 55 Fed. Reg. 50,510 (1990).

not adversely affect similarly employed American workers. 8 C.F.R. § 214.2(h)(6)(iii)(A). Without that certification, the new rules barred Homeland Security from considering a petition for H-2B visas. § 214.2(h)(6)(iii)(C).[3] The standards Labor was to use in issuing a certification remained largely the same: whether there are enough American workers who can fill the positions and whether the employment of nonimmigrants will adversely affect wages of similarly employed Americans. § 214.2(h)(6)(iii)(A).

Along with Homeland Security's labor-certification requirement, Labor promulgated Wage Rules setting the methodology for how to calculate the prevailing wages to be paid to the H-2B workers. These rules were met with a flurry of litigation and several orders about their legality. A district court held that those Wage Rules violated the APA and gave Labor 120 days to issue new rules. *Comite de Apoyo a los Trabajadores Agricolas v. Solis*, No. 09–240, 2010 WL 3431761, at *27 (E.D. Pa. Aug. 30, 2010). But Labor continued using these rules until a district court enjoined it in 2013. *Comite de Apoyo a los Trabajadores Agricolas v. Solis*, 933 F. Supp. 2d 700, 716 (E.D. Pa. 2013).

---

[3] Before the 2008 Rules, Homeland Security could review a petition de novo without a certification and make a final determination regardless of Labor's input. *See* 8 C.F.R. § 214.2(h)(6)(iv)(D), (E) (2008); *see also* 31 Fed. Reg. 4446, 6611 (1966) (countervailing evidence allowed). Under the 2008 Rules, an employer denied a certification was limited to review within Labor by its Board of Alien Labor Certification Appeals. 73 Fed. Reg. 78,063 (to be codified 20 C.F.R. § 655.33(a)). Receiving a favorable Labor determination is thus a condition precedent to a petition to Homeland Security. 73 Fed. Reg. 78,127, 78,129. Homeland Security made this change because it believed that Labor had the required expertise and that Homeland Security's review added nothing. 73 Fed. Reg. 78,104, 78,110.

Around the same time the courts enjoined the 2008 Wage Rules, Labor issued rules establishing the procedures for issuing labor certifications. These rules were also challenged with mixed results. The Eleventh Circuit enjoined them, finding that Labor lacked authority to issue rules with respect to the H-2B program. *Bayou Lawn & Landscape Servs. v. Sec'y of Labor*, 713 F.3d 1080, 1085 (11th Cir. 2013); *see also Bayou Lawn & Landscape Servs. v. Perez*, 81 F. Supp. 3d 1291, 1300 (N.D. Fla. 2014) (vacating the rules on the same grounds) (mooted by the 2015 Rules). But the Third Circuit rejected a similar challenge, finding Labor did have rulemaking authority based on congressional acquiescence. *La. Forestry Ass'n Inc. v. Sec'y U.S. Dep't of Labor (LFA)*, 745 F.3d 653, 669 (3d Cir. 2014). To resolve the regulatory gap created by the various injunctions, Labor proposed more rulemaking to determine prevailing wages and continued using the 2008 procedural rules. But the 2008 Rules were again enjoined by another district court. *Perez v. Perez*, No. 14-cv-682, 2015 U.S. Dist. LEXIS 27606 (N.D. Fla. Mar. 4, 2015). Because of the various court orders, "Labor ceased operating the H-2B program." 80 Fed. Reg. 24,151.

To restart the H-2B program, Homeland Security and Labor jointly promulgated the 2015 Program and Wage Rules. *See* 80 Fed. Reg. 24,045 (noting the agencies acted jointly "[t]o ensure that there can be no question about the authority for and validity of the regulations in this area"). First, Homeland Security and Labor issued the 2015 Program Rules establishing "the process by which employers obtain a temporary labor certification" from Labor for use in petitioning Homeland Security. 80 Fed. Reg. 24,042. Second, they issued the 2015 Wage Rules establishing the methodology by which Labor "calculates the

9

prevailing wages to be paid to H-2B workers." 80 Fed. Reg. 24,152. These 2015 Rules were both promulgated under the "good cause" exception to full notice-and-comment rulemaking. 80 Fed. Reg. 24,047, 24,152. Although not required, the agency still took and reviewed public input. 80 Fed. Reg. 24,050, 24,153. The Rules rested on the same statutes that the regulations promulgated in 1968 had, along with various regulations. 8 U.S.C. §§ 1101, 1103, 1184; 8 C.F.R. § 214.2; *see* 80 Fed. Reg. 24,108; 20 C.F.R. § 655 (2015 Program Rules); 80 Fed. Reg. 24,184; 20 C.F.R. § 655 (2015 Wage Rules).

The 2015 Rules have also been challenged. The Government has already prevailed in two cases challenging the new rules. *See Comite de Apoyo a los Trabajadores Agricolas v. Perez,* 148 F. Supp. 3d 361, 364 (D.N.J. 2015) (finding plaintiffs lacked standing); *Bayou Lawn & Landscape Servs. v. Johnson*, 173 F. Supp. 3d 1271, 1276 (N.D. Fla. 2016) (rejecting APA procedural challenges). Even so, Employers here challenge the 2008 and 2015 Rules as exceeding the agencies' authority.

## C. Procedural history

Employers sought declaratory and injunctive relief, and both parties cross moved for summary judgment. The district court noted in passing that Employers had standing and then found that their challenges to the 2008 Rules were time-barred. *Outdoor Amusement Bus. Ass'n, Inc. v. Dep't of Homeland Sec.*, 334 F. Supp. 3d 697, 713 (D. Md. 2018). In any event, the court found that Homeland Security could adopt the 2008 Rules under *Chevron* because Homeland Security could reasonably interpret its "consultation with appropriate agencies" to allow it to require Labor's certifications as a condition precedent. *Id*. at 716. The court found that locating the authority for the 2015 Rules was

10

trickier but ultimately upheld them based on congressional acquiescence to Labor's continued role in the program. *Id.* at 719. The court granted the government's motion for summary judgment, thereby upholding the regulations. Employers timely appealed the district court's final order. The district court had federal-question jurisdiction under 28 U.S.C. § 1331, and we have jurisdiction under 28 U.S.C. § 1291.

## II. Discussion

We review de novo the district court's grant of summary judgment. *J.D. ex rel. Doherty v. Colonial Williamsburg Found.*, 925 F.3d 663, 669 (4th Cir. 2019). And the issues raised on appeal are all legal questions that we review de novo: standing, *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 181 (4th Cir. 2013); statute of limitations, *Cruz v. Maypa*, 773 F.3d 138, 143 (4th Cir. 2014); and APA challenges to statutory authority, *Perez v. Cuccinelli*, 949 F.3d 865, 872 (4th Cir. 2020). Because standing implicates our Article III power to hear the case, we must resolve it first. *Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 597 (2007).

### A. Justiciability

To establish standing, the Employers must show: (1) a concrete and particularized injury that is actual or imminent, (2) a causal connection between the injury and the defendant's conduct, and (3) a likelihood that a court could redress the injury. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). A plaintiff has the burden to "demonstrate standing for each claim he seeks to press" and "for each form of relief" sought. *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008).

11

Employers seek to enjoin the 2008 and 2015 Rules. To have standing to seek an injunction, Employers must show they are in immediate danger of sustaining some direct injury. *City of Los Angeles v. Lyons*, 461 U.S. 95, 101–02 (1983). Mere "[p]ast exposure to illegal conduct does not in itself show a present case." *Id.* at 103. That said, "continuing, present adverse effects" from past illegal conduct can suffice, and past wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury. *O'Shea v. Littleton*, 414 U.S. 488, 495–496 (1974). "The prospect of future injury becomes significantly less speculative where, as here, plaintiffs have identified concrete and consistently-implemented policies claimed to produce such injury." *In re Navy Chaplaincy*, 697 F.3d 1171, 1176–77 (D.C. Cir. 2012). Similarly, the more "concrete" the plan and the "specification of when" plaintiffs will act and face these policies makes a future injury more imminent. *Lujan*, 504 U.S. at 564.

Employers received every labor certification and visa they requested. But their injury stems from the alleged costs and delays that come from the new rules. Employers offer specific facts that several of their members faced increased compliance costs because of the new regulations and delays in getting workers, which caused layoffs, lost revenue, contractual defaults, and even bankruptcy. Supplemental Br. of Employers 2, 10; Chiecko Aff. 2–5. Outdoor Amusement itself says the regulations have hurt membership, reduced dues, diverted resources, and increased litigation costs. *Id.*

### 1. There is standing to challenge the 2008 Rules but the challenge is time-barred

The Government argues that no plaintiff has standing to challenge the 2008 Rules because none of them were ultimately denied labor certifications or visas. Thus, their only injuries stem from compliance costs and delays, so enjoining the 2008 Rules would not remedy their injuries because they would still have to get a labor certification under the preexisting rules. 8 C.F.R. § 214.2(h) (1968); 20 C.F.R. § 621.3 (1968); 33 Fed. Reg. 7570–71 (1968); 38 Fed. Reg. 35,427 (1973). The only difference would be that Homeland Security could review denials of certifications. But the Government argues that Employers did not have any certifications denied, so an injunction would not redress their injuries. *G.H. Daniels*, 626 F. App'x at 207; 31 Fed. Reg. 4446, 6611 (1966) (countervailing evidence allowed).

There is, however, one plaintiff who claims injuries that could be redressed by enjoining the 2008 Rules. And only one plaintiff needs to have standing for a court to hear the case. *Bowsher v. Synar*, 478 U.S. 714, 721 (1986). Plaintiff Three Seasons, a landscaping company, was at first denied a labor certification for failure to comply with the 2015 Rules. After that denial, it was required by Labor to re-apply as a job contractor. J.A. 101–02. By the time Three Seasons re-applied and jumped through all of Labor's hoops to receive a certification, half the season was over, and the workers did not arrive in time. *Id.* Without the 2008 Rules, Three Seasons could have gone to Homeland Security directly and offered countervailing labor-market evidence after Labor denied certification, potentially avoiding the re-application process and the costly procedures and delay that

13

accompany it. *G.H. Daniels*, 626 F. App'x at 207; 31 Fed. Reg. 4446, 6611 (1966) (countervailing evidence allowed); 38 Fed. Reg. 35,427 (1973) (same). But under the 2008 Rules, Three Seasons had to re-apply and meet Labor's other demands to get a labor certification before they could even petition Homeland Security. 8 C.F.R. § 214.2(h)(6).

While it is true that mere "past exposure to illegal conduct does not in itself show a present case," *Lyons*, 461 U.S. at 103, this past exposure evidences a non-speculative threat of future injury. Three Seasons will continue to seek H-2B visas in the upcoming season and will again be subject to the 2008 Rules when they do. And where a policy that produced a plaintiff's prior injuries remains in effect, "[t]he prospect of future injury becomes significantly less speculative." *Navy Chaplaincy*, 697 F.3d at 1176–77; *Lyons*, 461 U.S. at 105–06 (the existence of a policy authorizing the injurious conduct and a high likelihood of again being subject to that policy suffices to establish standing). The 2008 Rules facilitated Three Seasons' injury and will continue to facilitate potential future injuries. *Id*. Indeed, the nature of Labor's inquiry confirms that Three Seasons could be denied again. If there are "United States workers capable of performing the temporary services" for Three Seasons one year, there will likely be workers available the next. 8 C.F.R. § 214.2(h)(6)(iii)(A). Similarly, if Three Seasons employing aliens "will adversely affect the wages and working conditions of similarly employed United States workers" one year, it is highly likely that its doing so the next year will lead to similar adverse effects. 8 C.F.R. § 214.2(h)(6)(iii)(A). Moreover, if the evidence Three Seasons needs to provide to get a labor certification is difficult to produce or if Labor in its discretion discounts some of Three Seasons' countervailing evidence that Homeland Security could consider, then it

14

is not speculative to surmise that it may be forced to reapply in the future. Thus, because Three Seasons faced increased delays and costs one year, those injuries were caused by the 2008 Rules, and Three Seasons continues to seek H-2B visas and be subject to the 2008 Rules, there is enough evidence to show an immediate future injury to establish standing for an injunction.

But even with standing, Employers still must bring their case within the applicable statute of limitations. Employers brought a facial challenge against the 2008 Rules in 2016, eight years after they were promulgated. 73 Fed. Reg. 78,104. The law is clear, however, that "every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues." 28 U.S.C. § 2401(a). The Fourth Circuit has held that when "plaintiffs bring a facial challenge to an agency [action] . . . the limitations period begins to run when the agency publishes the regulation." *Hire Order Ltd. v. Marianos*, 698 F.3d 168, 170 (4th Cir. 2012).[4] The claim is facial, as Employers are seeking to enjoin the Rules as improperly issued. As a result, the statute of limitations began to run eight years before this suit was filed. As the challenge

---

[4] Our sister circuits are divided on whether to recognize an equitable exception to the statute of limitations in 28 U.S.C. § 2401(a) when a plaintiff raises an ultra vires challenge to agency action. Here, however, Plaintiffs have not relied on such an exception. Although this is an important issue deserving of the Court's attention, we will forgo weighing in until the matter is properly presented.

needed to be brought within six years, 28 U.S.C. § 2401(a), the challenge to the 2008 Rules is barred.[5]

## 2. There is standing to challenge the 2015 Program and Wage Rules

The challenges to the 2015 Program and Wage Rules, however, may go forward. Employers have provided enough specific facts to show that the 2015 Program and Wage Rules have harmed them and that they will continue to harm them in the future. Employers have proffered evidence that the Rules will cost over a billion dollars in ten years. And they have shown that the delays and compliance costs of dealing with the wage calculations, increased wages, and procedures for the labor certifications have cost them and their members greatly. *Id*. The harms include contractual defaults and damages, layoffs, understaffing of up to 30%, lost customers, and even bankruptcy. J.A. 30–34, 64–66. Three Seasons lost most of its customers and supervisors because of delays. J.A. 102. Plaintiff Lasting Impressions had to file for bankruptcy and lost 30% of its customers. J.A. 99. Such compliance costs and economic harms related to regulations are cognizable injuries. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 347 (1977). Outdoor

---

[5] Employers argue that the D.C. Circuit's "reopening doctrine" renders their claim timely. In the D.C. Circuit, the reopening doctrine applies to restart the statute-of-limitations clock where an agency "serious[ly], substantive[ly] reconsider[s]" an earlier regulation. *Nat'l Min. Ass'n v. U.S. Dep't of Interior*, 70 F.3d 1345, 1352 (D.C. Cir. 1995). Even assuming this Court would adopt the doctrine—an issue we need not reach today— we agree with the district court that it would not apply here because "[n]one of the 2015 Rules reopened [Homeland Security]'s 2008 decision to require an employer to first obtain 'a favorable labor certification determination' from [Labor] before applying for an H-2B visa." *Outdoor Amusement Bus. Ass'n*, 334 F. Supp. 3d at 713.

Amusement also claims that over 100 members have used the H-2B visa program and plan to do so again. Chiecko Aff. 2–5. Many of their members have received visas several years in a row and will continue to seek visas, facing similar costs in the future. *Id.* Lasting Impressions, for example, has received 12 visas in both of the last 2 years. Appellee's Supplemental Br. at Exhibit B. Many cases reviewing challenges to these or similar regulations have found similar facts enough to confer standing. *See, e.g.*, *Bayou*, 173 F. Supp. 3d at 1282*; LFA*, 889 F. Supp. 2d at 720; *Comite de Apoyo a los Trabajadores Agricolas*, 2010 WL 3431761, at \*5.

This evidence suffices to show injury in fact for the 2015 Program and Wage Rules and to show a likelihood of future harm. Employers have provided evidence of past injuries from these regulations in the form of compliance costs and delays and have made credible allegations that many Employers will continue to apply for H-2B visas. *See Steffel v. Thompson*, 415 U.S. 452, 459–60 (1974); *see also Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979). It is also clear when this future harm will occur: when they apply for visas in the upcoming season. Employers must either forgo seeking the benefits of H-2B visas or face costly delays and compliance costs. *See Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 386 (1988). All told, it is likely that Employers face a concrete prospect of future harm, and they therefore have standing to seek an injunction.

Further, Outdoor Amusement has standing to sue on behalf of its injured members. An association has associational standing when at least one of its "identified" members "would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested

17

requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Env't. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). The Supreme Court has regularly found associational standing for trade associations when an injunction would benefit many of their members. *Hunt*, 432 U.S. at 342. As shown above, at least some of Outdoor Amusement's members have individual standing. And Outdoor Amusement represents and educates trade members, many of whom use H-2B visas. An injunction reducing delays and costs in the issuance of H-2B visas would therefore benefit many of its members without requiring any member's individual participation in the suit. Because Outdoor Amusement has associational standing, we need not address whether they have organizational standing.

* * *

Employers' challenges to the 2015 Program and Wage Rules are their only justiciable claims.[6] We therefore turn to the merits of those issues.

## B.     The 2015 Program and Wage Rules are valid

Executive agencies have broad, but not unlimited, authority to administer their programs. Employers argue that Homeland Security and Labor have exceeded their

---

[6] Although Employers also sought to challenge certain enforcement rules passed in 2015, they lack standing to do so. *See* 80 Fed. Reg. 24,084. As part of the 2015 Rules, Labor and Homeland Security promulgated 2015 Enforcement Rules that "set[] forth enforcement procedures and remedies" under Homeland Security's delegation of enforcement authority to Labor. *See* 80 Fed. Reg. 24,046 (Enforcement Rule); 80 Fed. Reg. 24,131; 73 Fed. Reg. 78,115, 78130; 8 C.F.R. § 214.2(h)(6)(ix); *see also* 8 U.S.C. § 1184(c)(14)(B) (statutory authority to delegate enforcement powers).

No Employer has shown that it was or will be injured by the 2015 Enforcement Rules. In fact, Employers have made no specific claims against the 2015 Enforcement (Continued)

18

statutory authority to administer the H-2B program by promulgating the 2008 Rules and the 2015 Program and Wage Rules. 5 U.S.C. §§ 558, 706(2)(C).

Because the challenge to Homeland Security's 2008 Rules is time-barred, we need not decide whether Homeland Security may interpret "consultation" to require a favorable labor certification from Labor before considering an H-2B petition.[7] But for that labor-certification process, we must decide whether Homeland Security or Labor had statutory authority to promulgate the 2015 Program and Wage Rules. We find they did. The statutory circumstances reveal that Congress implicitly delegated Labor rulemaking authority to administer its labor certifications as part of its duty as the consulting agency.

As Employers point out, "[i]t is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress."

---

Rules. J.A. 91–110; Supplemental Br. of Employers 4. Instead, they claim generally that the Enforcement Rules are included in the 2015 Rules. But plaintiffs must show standing for each claim and form of relief. Without having alleged a past injury or made specific claims against the 2015 Enforcement Rules, Employers lack standing to enjoin those rules.

[7] *See* 8 U.S.C. § 1184(c)(1); *Consult*, 3 OXFORD ENGLISH DICTIONARY 799–800 (2d ed. 1989) ("To confer about, deliberate upon, debate, discuss, consider (a matter)"), ("To ask advice of, seek counsel from; to have recourse to for instruction, guidance, or professional advice"), *but see id*. ([T]o seek permission or approval from (a person) for a proposed action"). *See also Bennett v. Spear*, 520 U.S. 154, 169 (1997) (noting that while the duty to "consult" in section 7 of the Endangered Species Act is technically "advisory," in effect it has a "powerful coercive effect" that renders the "consultation" essentially nondiscretionary); *Lopez v. Davis*, 531 U.S. 230, 243–44 (2001) ("[E]ven if a statutory scheme requires individualized determinations . . . the decisionmaker has the authority to rely on rulemaking to resolve certain issues of general applicability unless Congress clearly expresses an intent to withhold that authority." (internal quotations omitted)).

19

*Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988).[8] But that delegation need not be express, "it can still be apparent from the agency's generally conferred authority and other statutory circumstances that Congress would expect the agency to be able to speak with the force of law when it addresses ambiguity in the statute or fills a space in the enacted law." *United States v. Mead Corp.*, 533 U.S. 218, 229 (2001). The "power of an administrative agency to administer a congressionally created and funded program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress." *Morton v. Ruiz*, 415 U.S. 199, 231 (1974). When a gap exists, "a court may assume that Congress implicitly delegated the interpretive function to the agency." *Public Citizen v. F.T.C.*, 869 F.2d 1541, 1553 (D.C. Cir. 1989); *see also Tex. Rural Legal Aid, Inc. v. Legal Servs. Corp.*, 940 F.2d 685, 691 (D.C. Cir. 1991) (finding that the Legal Services Corporation has an implied delegation to rulemake). And in filling these gaps, agencies can choose between rulemaking and adjudications. *Morton*, 415 U.S. at 232; *Sec. & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194, 202–03 (1947) (*Chenery II*).

The broad statute here leaves gaps to be filled. The relevant section says that "any specific case or specific cases shall be determined by the [Secretary], *after consultation with appropriate agencies* of the Government, upon petition of the importing employer. . . . The petition shall be in such form and contain such information as the

---

[8] We assume that at least some of these rules are legislative rather than procedural. *Compare Mendoza v. Perez*, 754 F.3d 1002, 1023–25 (D.C. Cir. 2014), *with* 20 C.F.R. § 655.20.

[Secretary] shall prescribe." 8 U.S.C. § 1184(c)(1) (emphasis added).  Congress made its intent clear that a consulting agency or agencies chosen by Homeland Security would help Homeland Security in considering petitions for H-2B visas.  In doing so, Congress left gaps in the form of consultation, the identity of the consulting agency or agencies, and the content of the petitions.  *Id*.  Homeland Security has used the resulting discretion to fill these three gaps:  Homeland Security chose Labor as the appropriate agency; determined that it would consult with Labor through labor certifications; and decided that the petitions must include an *approved* labor certification, along with other evidence such as a statement of the employer's need and the alien's qualifications.  8 C.F.R. § 214.2(h)(6)(iii); 8 C.F.R. § 214.2(h)(6)(vi).  Homeland Security's choice to fill the statutory gaps by consulting with Labor through labor certifications reflects a consistent practice for H-2 visas that various agencies have engaged in since at least 1968.  *See* 8 C.F.R. § 214.2 (1968); *see also* 18 Fed. Reg. 4925 (1953); 38 Fed. Reg. 35,427 (1973); 8 C.F.R. § 214.2(h)(6).

Once Homeland Security used its discretion to consult with Labor through labor certifications, this imposed a duty on Labor as the consulting agency to administer the grant of those certifications.  Once designated as the consulting agency, Labor still faced statutory gaps in how to administer the consultation.  This "necessarily requires the formulation of policy and the making of rules to fill" that statutory gap.  *Morton*, 415 U.S. at 231.  And Labor may choose rulemaking to structure the certification process.  *See Chenery II*, 332 U.S. at 202–03.  Indeed, courts—and the regulated community—often prefer rulemaking to adjudication for the former's transparency, public input, notice, process, review, and stability.  *See id*. (advocating rulemaking over adjudications); David

21

L. Shapiro, *The Choice of Rulemaking or Adjudication in the Development of Administrative Policy*, 78 HARV. L. REV. 921, 929–42 (1965) (same).  The alternative is for Labor to use an unstructured ad hoc process or return to informal guidance letters, both of which could lead to further delays, costs, and reduced accountability through shifting determinations.  *See LFA*, 889 F. Supp. 2d at 716–17 (collecting various letters).  But Congress adopted the APA to provide agencies with procedures that avoid "the inherently arbitrary nature of unpublished ad hoc determinations."  *Morton*, 415 U.S. at 232.

The statutory provisions surrounding § 1184(c)(1) show that Labor possesses implicit rulemaking authority.  For example, the definition of H-2B explains that an H-2B visa may be obtained only if American workers cannot be found to fill the relevant jobs.  8 U.S.C. § 1101(a)(15)(H)(ii)(b).  This section leaves a gap as to how to determine when U.S. workers are available.  Homeland Security has sensibly chosen to rely on Labor's expertise in the labor market to make a two-part determination for issuing a labor certification:  "whether or not United States workers capable of performing the temporary services or labor are available and whether or not the alien's employment will adversely affect the wages and working conditions of similarly employed United States workers."  8 C.F.R. § 214.2(h)(6)(iii)(A).  Neither judgment is self-evident.  To fulfill its consultative duty, Labor could make rules to define how it would judge whether American workers were available and whether foreign workers would impact American workers' wages.  So the 2015 Program and Wage Rules provide guidance, setting the standards for calculating wages, identifying the information required, identifying the minimum hours and wages

required, and detailing the obligation to seek American workers first. 20 C.F.R. §§ 655.10, 655.16, 655.18, 655.20.

Congress has also given Labor varying degrees of control and responsibility over labor certifications in other parts of the INA, including H-2A visas. 8 U.S.C. § 1101(a)(15)(H)(ii)(a) (H-2A nonimmigrant agricultural worker); § 1184(c)(1); § 1188(a)(1) (H-2A); § 1182(a)(5) (permanent labor certifications); § 1182(n) (H-1B nonimmigrant workers). For these visas, Labor can promulgate rules. *See* 20 C.F.R. § 655.700–60 (H-1B regulations); 20 C.F.R. § 656.10–32 (permanent labor certifications); *Mendoza*, 754 F.3d at 1021 (noting that Labor has legislative rulemaking authority for H-2A but this means they must go through notice and comment); *Kutty v. U.S. Dep't of Labor*, 764 F.3d 540, 547–48 (6th Cir. 2014) (acknowledging Labor rulemaking authority for H-1B). In a similar case, the Seventh Circuit found that Labor has "inherent" authority to promulgate rules for permanent labor certifications because part of the INA required such certifications. *Prod. Tool Corp. v. Emp. & Training Admin., U.S. Dep't of Labor*, 688 F.2d 1161, 1166–67 (7th Cir. 1982). There, the court upheld regulations requiring employers to have unsuccessfully advertised a job opportunity to American workers to get a certification despite Labor lacking express rulemaking authority. *Id.* Labor promulgated similar rules here. 20 C.F.R. §§ 655.10–20. So a statutory basis for Labor to issue labor certifications grants Labor the inherent authority to pass regulations governing them. And that implicit delegation to promulgate rules similarly applies based on the statutory consulting duty under H-2B. Rules are just as necessary for the administration of Labor's role under each type of visa. *LFA*, 745 F.3d at 674.

Employers counter with the *expressio unius* canon: because Congress chose Labor as the consulting agency and defined its role elsewhere in the INA, the fact that Congress did not do so here means Congress meant to preclude Labor from occupying a similar role for H-2B visas. *See Bayou Lawn & Landscape*, 713 F.3d at 1084–85 (relying on similar reasoning to determine that Labor does not have rulemaking authority). The Supreme Court has said that Congress must "clearly delineate[] the general policy, *the public agency which is to apply it, and the boundaries of this delegated authority.*" *Mistretta v. United States*, 488 U.S. 361, 372–73 (1989) (emphasis added). And Employers argue that this is a clear statement rule that requires a statute to identify the agency by name. Employers also argue that there is a presumption that only one agency will have authority to promulgate rules under a statute, a presumption that they contend serves to avoid the promulgation of conflicting rules. *See Union Pac. R.R. Co. v. Surface Transp. Bd.*, 863 F.3d 816, 826 (8th Cir. 2017). So Employers claim that Homeland Security has sole rulemaking authority because Labor is neither named nor given functions specifically for the H-2B program (in contrast with other provisions of the INA that specify Labor as the agency to perform certain functions).

These contentions fail for two reasons. First, the existence of unconstrained discretion under H-2B does nothing to imply that Labor could not be chosen for the same role it has elsewhere. The D.C. Circuit rejected a similar *expressio unius* argument where one part of a statute provided procedures for handling competing bids but another section was silent. *Cheney R. Co. v. ICC*, 902 F.2d 66, 68–69 (D.C. Cir. 1990). The court explained that "the contrast between Congress's mandate in one context with its silence in

24

another suggests not a prohibition but simply a decision not to mandate any solution in the second context, i.e., to leave the question to agency discretion." *Id.* (emphasis omitted). Here, the same section requires Homeland Security to engage in "consultation with appropriate agencies" for H-2B and H-2A visas. 8 U.S.C. § 1184(c)(1). That section then goes on to explicitly define the appropriate agencies for H-2A as Labor or Agriculture and other sections outline the form of that consultation. 8 U.S.C. § 1184(c)(1); § 1188(a). But the same sections are silent on the agency and type of consultation for H-2B visas. This implies discretion, not limitation. *See Cheney*, 902 F.2d at 68–69. Surely Congress did not intend to give the consulting agency Homeland Security chooses for H-2B less power than Labor in its consulting role for H-2A when Congress used the same word in the same section but did not direct how that consultation can be done.

History also supports our reading. Labor has been consulting through labor certifications and has promulgated rules governing the certifications since at least 1968, before H-2A and H-2B were divided. 33 Fed. Reg. 7570 (1968 Labor regulation governing the certification process); 43 Fed. Reg. 19,306 (1978); 55 Fed. Reg. 50,510 (1990). Only in 1986 did Congress separate H-2B from H-2A and specify that the consulting agencies for H-2A were Labor or Agriculture. Immigration Reform and Control Act, Pub. L. No. 99-603, § 301(a), 100 Stat. 3359, 3411 (codified at 8 U.S.C. §§ 1101(a)(15)(H)(ii)(a)–(b); 1184(c)). But Congress left the H-2B language alone, and Labor continued to consult just as it had before. *Id.*; *LFA*, 745 F.3d at 661. By specifying the consulting agency for H-2A but not H-2B despite both historically relying on Labor, Congress has evidenced its intent to give Homeland Security more discretion in H-2B, including the discretion to continue

25

the historical practice of relying on Labor and its rulemaking if it so chooses. *LFA*, 745 F.3d at 674. That Labor has been providing labor certifications and has promulgated rules governing them for decades before the 2008 Rules without serious challenge from the political branches or courts is at least some evidence that Congress intended that the consulting agency could rulemake and that the chosen consulting agency could be Labor. Thus, not naming the consulting agency provides Homeland Security with more discretion and does nothing to show that rulemaking authority was withheld from the consulting agency.

Second, multiple agencies commonly cooperate with overlapping statutory duties. *See generally* Jody Freeman & Jim Rossi, *Agency Coordination in Shared Regulatory Space*, 125 HARV. L. REV. 1131 (2012). Employers do not contend that Labor's role in H-2A raises any concerns, so it is not clear why having an unnamed agency with a consulting role in H-2B would create problems. An analogous example comes from section 7 of the Endangered Species Act: "[e]ach federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action . . . is not likely to jeopardize the continued existence of any endangered species." 16 U.S.C. § 1536(a)(2). Under this law, if an agency action might harm an endangered species, that agency must start a consultation with the Fish and Wildlife Service, which then prepares a "biological opinion" on the potential harm. Eric Biber, *Too Many Things to Do: How to Deal with the Dysfunctions*

26

*of Multiple-Goal Agencies*, 33 HARV. ENVTL. L. REV. 1, 53–54 (2009).[9]  In administering this statutory requirement, the Fish and Wildlife Service has promulgated regulations governing the consultation and its relationship with other agencies.  50 C.F.R. §§ 402.10–17.  If a consulting agency may issue regulations that impact many unnamed agencies, it is not clear why Labor, with Homeland Security's blessing, cannot promulgate regulations to structure its consulting role.  Based on statutory circumstances, history, and similar laws, we find that the unnamed consulting agency—which Homeland Security may choose—has implicit rulemaking authority that may overlap with Homeland Security's authority in a symbiotic relationship set out by the statute.

The Eleventh Circuit rejected this implicit delegation for Labor to rulemake based on its role as a consulting agency because this would mean that "any federal employee with whom the Secretary of [Homeland Security] deigns to consult would then have the authority to issue legislative rules to structure [his] consultation with Homeland Security." *Bayou Lawn*, 713 F.3d at 1084.  We find this concern unwarranted.[10]  Homeland Security

---

[9] If the "biological opinion" finds a potential harm, it "must outline any 'reasonable and prudent alternatives' that the Service believes will avoid that consequence," which the acting agency must consider. *Bennett v. Spear*, 520 U.S. 154, 158 (1997).  While these suggestions are "advisory" and an agency could theoretically reject them, the Supreme Court has found that the potential liability from not following the advice has a "powerful coercive effect" that renders them essentially nondiscretionary. *Id*. at 169.  In fact, unless the agency follows the "advice" given in the consultation, an incidental taking can lead to "substantial civil and criminal penalties, including imprisonment." *Id*. at 170.

[10] Because we find that Labor has an implied delegation, there is no subdelegation issue.  Homeland Security did not subdelegate any of its power; it carried out its statutory duty to consult by choosing to require labor certifications from Labor, as various agencies have historically done.  Labor, as the consulting agency, then got its own implied (Continued)

27

lacks unlimited discretion to consult with any agency, much less any federal employee. The statute requires "consultation with *appropriate agencies* of the Government." 8 U.S.C. § 1184(c)(1) (emphasis added). Not only must the consulting party be an agency rather than any employee, but it must be an "appropriate" agency. *Id*. Even under *Chevron* deference, some choices of "appropriate agencies" would not be reasonable. *Id*.; *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984). What is appropriate depends on the statutory circumstances, including the definition of H-2B. § 1101(a)(15)(H)(ii)(b). And if the agency does not adequately explain its choices, it may be subject to an arbitrary and capricious challenge. 5 U.S.C. § 706(2)(A). For example, Homeland Security might consult with the Department of Commerce or the Treasury Department if they could rationally tie that choice to their statutory duty, such as a reliance on whatever expertise those Departments might have on wages and the labor market. Choosing the Fish and Wildlife Service, on the other hand, is likely impermissible as they would probably not be an appropriate agency (barring some unusual justification). This does not give Homeland Security carte blanche to bestow legislative rulemaking authority on anyone in the executive branch. And here Labor is an appropriate agency given their expertise and historical role in providing information on the availability of American workers. § 1101(a)(15)(H)(ii)(b); 20 C.F.R. § 621.3(a) (1968) (original regulation requiring Labor to find that American workers were unavailable); 8 C.F.R.

---

delegation from Congress to administer its consulting duty, not a subdelegation from Homeland Security.

28

§ 214.2(h)(6)(iii)(A) (similar regulation today based on H-2B definition); 73 Fed. Reg. 78,104, 78,110 (Homeland Security's review adds nothing to Labor's expertise).

And even when Homeland Security chooses an appropriate consulting agency, that agency does not acquire unlimited rulemaking authority or even authority commensurate with Homeland Security. The Supreme Court has said that a regulation must be "reasonably related to the purposes of the enabling legislation." *Mourning v. Family Publ'ns Serv., Inc.*, 411 U.S. 356, 369 (1973). The promulgating agency must "establish a nexus between the regulations and some delegation of the requisite legislative authority by Congress." *Chrysler Corp. v. Brown*, 441 U.S. 281, 304 (1979). So any rules that Labor promulgates relating to H-2B visas must relate to its consulting role, and that role is in part defined by Homeland Security's regulations choosing them as the consulting agency and defining their consultation. Homeland Security chose Labor as the consulting agency, chose the form of consultation as labor certifications, and required Labor to determine the availability of American workers and the effect on their wages. 8 C.F.R. § 214.2(h)(6)(iii)(A). Labor's consulting role and the resulting gap in how to administer it is defined by Homeland Security's regulations. As a result, Labor's regulations must be reasonably related to administering their labor certifications and making the determinations about the labor market and required wages. The regulations here relate to filling the statutory gap of how to administer the required consultation that Homeland Security has chosen. The 2015 Rules do just that by establishing "the process by which employers obtain a temporary labor certification from [Labor] for use in petitioning [Homeland Security]" and "the methodology for determining the wage that a prospective H-2B

29

employer must pay." 80 Fed. Reg. 24,042, 24,046. Homeland Security is limited in its ability to choose an "appropriate" agency to consult with and, once chosen, Labor is limited in its rulemaking authority. But here, the 2015 Program and Wage Rules are well within the scope of that limited authority as designated by Congress.

The 2015 Program and Wage Rules are valid exercises of Labor's implied delegation to rulemake as part of its duty as Homeland Security's chosen consulting agency. This implied delegation is evident from the statutory circumstances in the INA, including the requirement that Homeland Security engage in "consultation with appropriate agencies," the definition of H-2B, and Labor's rulemaking powers for similar visas. While there are limits on which agencies Homeland Security can choose and on those agencies' ability to rulemake, Labor's 2015 Program and Wage Rules fall within both boundaries.

\*          \*          \*

Agencies have wide latitude in administering the programs Congress has tasked them with. But agencies do not have unlimited power in the areas they govern. As a result, those burdened by regulations may challenge agency actions as exceeding their statutory authority. Our job is to police the boundary between permissible agency actions that help fulfill the goals of the political branches and agency overreach that threatens to unjustly burden those they regulate and blur the lines upholding the separation of powers.

As one of the three branches, however, we also have our own limits. One of those limits comes from Article III itself: standing. Here, Employers have shown standing to

challenge the 2008 Rules and the 2015 Program and Wage Rules.[11] Another type of limit can be set by Congress: statutes of limitations. And Employers' facial challenge to the 2008 Rules is time-barred.

Once we have shown that we are operating within our lawful sphere, we can begin to examine the validity of agency actions. In doing so, we find that the 2015 Program and Wage Rules were properly promulgated based on Congress' implied delegation to Labor as the consulting agency. The Government's regulations stand, and the judgment of the district court is therefore

*AFFIRMED IN PART AND VACATED IN PART.*

---

[11] As mentioned above, the Employers lack standing to challenge the 2015 Enforcement Rules. Thus, we must vacate the portion of the district court's opinion that found the 2015 Enforcement Rules valid on the merits. Employers' challenge to the 2015 Enforcement Rules must be dismissed without prejudice. *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 185 (4th Cir. 2013) ("A dismissal for lack of standing—or any other defect in subject matter jurisdiction—must be one without prejudice, because a court that lacks jurisdiction has no power to adjudicate and dispose of a claim on the merits.").